**AFFIRM; and Opinion Filed July 17, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-01094-CV

### TRG-BRAES BROOK, LP, Appellant
### V.
### JAMES P. HEPFNER, JOHN W. AIRHART,
### and CHRISTOPHER SMITH, Appellees

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-16-00088**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Evans, and Schenck
Opinion by Justice Lang-Miers

In this breach of contract dispute arising out of a real estate transaction, a jury made findings in favor of appellees James P. Hepfner, John W. Airhart, and Christopher Smith, and the trial court rendered judgment for appellees. In five issues, appellant TRG-Braes Brook, LP contends the trial court erred by denying its motions for summary judgment and for directed verdict, and challenges the legal and factual sufficiency of the evidence to support the jury's verdict. We affirm the trial court's judgment.

### BACKGROUND

The Residences at Wycliff, Ltd., a limited partnership ("Wycliff"), owned real property on Congress Avenue in Dallas. Hepfner, Airhart, and Smith were "the sole and exclusive individual owners" of Wycliff. In 2012, Wycliff sold the property to an affiliate of appellant TRG-Braes

Brook, L.P. ("TRG"). As part of that transaction, Wycliff as "Seller" and TRG as "Owner" signed a "Participation Agreement" dated February 14, 2012, which provided:

> The parties hereto agree and acknowledge that Owner has not yet determined its final equity and capital structure for ownership, development and financing of the Property (which shall be determined by Owner in its sole discretion), but **the parties contemplate that $200,000 (the "Carried Interest") of the Owner's promoted interest in the Property (the "Promote"), if any, shall be granted to Seller**. The parties hereto agree (a) that the Carried Interest shall not earn any interest payment and will be subordinate to Owner's promoted interest and **shall not be received until Owner achieves a 2.0 equity multiple**, . . . . (c) that the Carried Interest and the terms of this Agreement shall be subject to approval in all respects by Owner's future lenders and Owner's future equity investors (Seller acknowledging that it shall not receive any such Carried Interest if Owner's future lenders or future equity investors do not permit or approve the same, but **Owner shall exercise reasonable efforts to obtain such approval of the Carried Interest from its future lenders and equity investors**) . . . .

(Emphasis added).

Hepfner and TRG's chief executive officer Brian Tusa negotiated the Participation Agreement. Both subsequently testified at trial about their negotiations and their understanding of the agreement's terms. The Carried Interest was a bonus payment to Wycliff if TRG's development of the property was successful.

In August 2012, Encore Housing Opportunity Fund, L.P. ("Encore") invested in TRG's project to build apartments on the property TRG had purchased from Wycliff. Encore did not consent to the Carried Interest payment to Wycliff.

Subsequently, Wycliff assigned its rights under the Participation Agreement to appellees. Wycliff and the appelles obtained TRG's consent to the assignment in an agreement dated August 21, 2012, entitled "Assignment of Ownership and Interest in Payments."

In July 2015, TRG sold the property at a profit, but did not make the Carried Interest payment to appellees. Appellees sued TRG for breach of contract, and the case was tried before a jury. Appellees contended that TRG did not use "reasonable efforts" to obtain Encore's approval of the Carried Interest payment.

Relevant to this appeal, the jury found that TRG did not "utilize 'reasonable efforts' to obtain its investor's consent." The jury also answered "yes" to the question, "Was the 2.0 equity multiplier in the Participation Agreement waived or excused by TRG?" The trial court rendered judgment on the jury's verdict, awarding appellees $200,000 in actual damages, plus attorney's fees, interest, and costs. This appeal followed.

## ISSUES AND STANDARDS OF REVIEW

In its first two issues, TRG argues the trial court erred by denying its first and second motions for summary judgment. Because the challenged rulings are not appealable, we overrule these issues without further discussion. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 625 (Tex. 1996) ("The general rule is that a denial of a summary judgment is not reviewable on appeal.").

In its third issue, TRG argues the trial court erred by denying its motion for directed verdict. In its fourth and fifth issues, TRG challenges the legal sufficiency of the evidence to support the jury's findings on two issues on which it did not have the burden of proof. We review these complaints under a legal sufficiency or "no evidence" standard of review. *See Mauricio v. Castro*, 287 S.W.3d 476, 478–79 (Tex. App.—Dallas 2009, no pet.) (denial of motion for directed verdict); *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011) (legal sufficiency challenge to jury's adverse findings).

We will sustain a legal sufficiency challenge when there is a complete absence of evidence of a vital fact; the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; the evidence offered to prove a vital fact is no more than a mere scintilla; or the evidence conclusively establishes the opposite of the vital fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). We consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller*

*v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We "must credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* at 827. Evidence is legally sufficient if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id.*

TRG's fourth and fifth issues also challenge the factual sufficiency of the evidence to support two of the jury's findings. In considering a challenge to the factual sufficiency of the evidence, we review the entire record and may set aside the verdict only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *Exxon Corp. v. Breezevale, Ltd.*, 82 S.W.3d 429, 438 (Tex. App.—Dallas 2002, pet. denied). The factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819 (legal sufficiency review); *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761 (factual sufficiency review). We may not substitute our own judgment for that of the factfinder merely because we might reach a different result. *City of Keller*, 168 S.W.3d at 819, 822; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761.

## DISCUSSION

### A. Reasonable efforts to obtain investor approval

In its fourth issue, TRG challenges the legal and factual sufficiency of the evidence to support the jury's finding that TRG failed to use reasonable efforts to obtain Encore's approval for the Carried Interest payment. The jury answered "No" to Question 1, "Did TRG utilize 'reasonable efforts' to obtain its investor's consent?" In Question 1, the trial court defined "reasonable efforts" as "the kind of efforts which a reasonable person in the actor's situation would rationally make to accomplish that goal or purpose."

Appellees offered evidence at trial about the purpose of the Carried Interest payment. Hepfner testified that in 2012, Wycliff's lender was "calling the note" on the property, but Wycliff was not in a position to "pay it off." TRG approached Wycliff about purchasing the property, and negotiations commenced. Wycliff attempted to negotiate a higher price, but "Mr. Tusa stated a couple of times that there wasn't anymore [sic] money to give us." Hepfner took Tusa aside in the negotiations, asking "could we have a Carried Interest payment in it which would get us to the number" Wycliff sought as the selling price. Tusa agreed, and the parties negotiated the necessary documents, including the Participation Agreement.[1]

The parties understood that TRG planned to obtain financing from an outside investor or lender in order to develop the property, and Hepfner testified that Wycliff "didn't want to hamper any of [TRG's] ability to get [its] financing." Consequently, Wycliff agreed that the Carried Interest payment was subject to consent by future lenders and equity investors. But in return, TRG promised to exercise "reasonable efforts to obtain such approval of the Carried Interest from its future lenders and equity investors." Hepfner explained that "[i]f my memory serves me correct, we wanted to make sure that he [Tusa] explained the deal to whoever it was that was out there—whether it was the bank or whether it was the equity player—in its entirety and that it was coming out of his side. That a reasonable effort was made." He continued,

> Q. Why did you want to make sure on behalf of your company that Mr. Tusa/TRG had to reasonably explain to the investor that the money was coming out of TRG's pocket? Why did you want that to occur?
>
> A. Primarily so that we get paid the $200,000. We believed that if it was explained in a reasonable manner, and it was—then we would probably end up getting the $200,000 if he was successful in his development.

---

[1] The parties also agreed that Wycliff would "receive $200,000 of any construction management fee" paid to TRG. There is no dispute regarding this fee.

Hepfner testified that the documents relating to the sale, including the Participation Agreement, referred to the Carried Interest payment as "$200,000 (the "Carried Interest") of the Owner's [TRG's] promoted interest in the Property (the "Promote"), if any." Hepfner explained that the "purchaser's promote" meant "TRG's share."

Following the sale, TRG proceeded to seek financing to develop the property, and began negotiations with Encore. Appellees offered evidence at trial that Joe DiCristina, Encore's president and chief investment officer who negotiated with Tusa on Encore's behalf, refused to consent to the Carried Interest payment because he thought—incorrectly—that Encore's profits would be diluted by it. Appellees also introduced evidence that Tusa did nothing to correct DiCristina's misapprehension.

Tusa testified that he discussed the subject of Encore's consent with DiCristina only once, in a telephone conversation. Tusa did not tell DiCristina that the Carried Interest payment was to be paid solely from TRG's funds. Tusa testified that after DiCristina read documents Tusa provided, DiCristina "thought the money was coming out of the investment, his pocket." Tusa did not correct DiCristina's understanding:

> Q. Did you tell [DiCrisitina] that that wasn't the case, that the money was actually supposed to come out of TRG's pocket?
>
> A. No.

Similarly, DiCristina testified:

> Q: In that phone conversation in 2012, did Mr. Tusa ever tell you that the carried interest fee was not coming out of the partnership profits; it was coming solely from TRG's share?
>
> A. Not to my recollection.

Although he could not point to specific language in the Participation Agreement to support it, Tusa testified that the Carried Interest payment "was always going to be coming out of the

equity partner," that is, Encore. But appellees countered that paragraph 2 of the Participation Agreement prohibited them from sharing in Encore's profits:

> 2. Nothing in this Agreement shall be construed as creating a partnership or joint venture or other relationship between Owner [TRG] and Seller [Wycliff]. Seller's only interest created hereunder is the contractual right to certain sums as expressly set forth in Section 1. Seller shall not have any rights or approvals regarding the Property, including without limitation any rights in any entity owning and operating the Property.

When questioned at trial about paragraph 2, Tusa admitted:

> Q. So under section 2, [appellees] could never have any rights in your entity that you created with Encore to develop and operate the property.
>
> A. No.
>
> Q. So did you ever tell Mr. DiCristina that?
>
> A. I don't recall specifically pointing out paragraph 2, as I have already said. But Mr. DiCristina had a copy of this agreement.
>
> . . .
>
> Q. Regardless of what he had, I'm more focused on what you told him. It sounds like you never told him—
>
> A. I don't specifically recall discussing paragraph 2. . . .
>
> . . .
>
> Q. But you agree with me that this provision, section 2, says that my guys [appellees] could never have any rights, could never share any interest with your new venture with Encore.
>
> A. That is correct.

DiCristina recalled that Tusa told him the money was to come from Encore:

> Q. So in that phone conversation with Mr. Tusa in 2012, who first raised the idea that the carried interest payment was coming out of the partnership profits?
>
> A. To the best of my recollection, Mr. Tusa.

Tusa testified that DiCristina refused to consent to the Carried Interest payment "because he thought the money was coming out of the investment, his pocket." Similarly, DiCristina testified

that he refused Encore's consent because "[i]f there was a third party entering the transaction, there would be a dilution of Encore's profits, which was not acceptable to us." He explained:

> A. . . . Encore was entering into an investment with Trinsic.[2] We were not entering into an investment with anyone other than Trinsic. And so in terms of a carried interest, we expected to be receiving profits at the venture that would only be shared between us and Trinsic. . . . So I objected to the Participation Agreement when [Tusa] asked me to—if we were willing to enter into this.

DiCristina also testified that he had no objection to TRG's paying any of its own funds to a third party:

> Q. But fees that didn't impact Encore, regardless of what they're called, they're of no consequence to Encore. TRG was able to pay whatever fees out of its own pocket that it wanted as long as it didn't impact Encore?
>
> A. Yes.
>
> Q. That's true with respect to whatever we call it? A development fee, construction fee, carried interest fee?
>
> A. Yes.

TRG relies on DiCristina's testimony that there was nothing more Tusa could have done to obtain his consent. But DiCristina's reason for saying so was that his "investment strategy was to have a business deal with Trinsic and with no one else." And the record reflects that Tusa did not explain the terms of the Participation Agreement to DiCristina or correct his misapprehension of its terms. DiCristina testified:

> Q. In your telephone conversation with Mr. Tusa in 2012, did he tell you that he wanted to honor this Participation Agreement with my clients?
>
> A. He didn't use those words.
>
> Q. Did he say he wanted to make these carried interest payments to my clients and please let us do that?
>
> A. He didn't use those words.

---

[2] Throughout the record, the parties often referred to TRG and its affiliates as "Trinsic," a related entity.

Tusa also admitted that he never communicated Encore's refusal to consent to appellees. Instead, approximately eight days after his conversation with DiCristina, Tusa signed an agreement assigning the Carried Interest payment to appellees individually when they sought to dissolve the Wycliff partnership entity.

In sum, Tusa testified that his efforts to obtain Encore's consent consisted of (1) providing a copy of the Participation Agreement to DiCristina, and (2) asking DiCristina once, in one telephone conversation, whether Encore would consent to the Carried Interest payment, without explaining that the payment would come from TRG's, not Encore's, share of any profits in the venture. This evidence, if believed by the jury, was sufficient to support a finding that TRG did not "utilize . . . the kind of efforts which a reasonable person in the actor's situation would rationally and logically make to accomplish" the "goal and purpose" of obtaining Encore's consent to the Carried Interest payment, as TRG had promised to do.

Considering the evidence in the light most favorable to the jury's verdict, we conclude that it "would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. Nor is the jury's finding manifestly unjust. *Jackson*, 116 S.W.3d at 761. Because the evidence was legally and factually sufficient to support the jury's finding that TRG did not utilize reasonable efforts to obtain Encore's consent, we decide TRG's fourth issue against it.

**B. Jury's waiver finding**

In its fifth issue, TRG argues the evidence was legally and factually insufficient to support the jury's finding that TRG "waived the condition precedent that a 2.0 equity multiple be achieved on the investment project prior to payment of the Carried Interest payment." Appellees respond that there was legally and factually sufficient evidence of waiver. They argue that TRG did not

rely on the equity multiple in denying payment, and otherwise prevented calculation of the equity multiple by refusing to provide the necessary financial information.

The jury found in response to Question 2 that the 2.0 equity multiplier condition was not satisfied. But in response to Question 5, the jury also found that the 2.0 equity multiplier condition was waived or excused. In Question 5, the trial court defined "waiver" as "an intentional surrender of a known right or intentional conduct inconsistent with claiming that right." The supreme court has explained, "[w]aiver—the 'intentional relinquishment of a known right'—can occur either expressly, through a clear repudiation of the right, or impliedly, through conduct inconsistent with a claim to the right." *G.T. Leach Builders, LLC v. Sapphire V.P., LP*, 458 S.W.3d 502, 511 (Tex. 2015); *see also Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 722 (Tex. App.—Dallas 2004, no pet.) ("Contractual rights can be waived.").

Hepfner, Tusa, and Joseph Barrett testified about the 2.0 equity multiplier condition. Hepfner testified that he asked Barrett, TRG's chief operating officer, for information supporting TRG's contention that the 2.0 equity multiple had not been met, but Barrett refused:

> A. . . . I called [Barrett] on the phone and asked him. He said, yeah, it [the property] had sold. I asked him about the carried interest payment. He said he would have to talk to Brian [Tusa]. He called me back and said that they hadn't received the two times equity multiple. That was it. I said, well, how do we know that? He said, well, we are telling you that we didn't—we didn't get to the two times equity multiple. . . . I said, why don't you prepare just a one-page spreadsheet, Johnny [Airhart] and I will come by the office, we will talk about it, and show me that we didn't receive the two times equity multiple. We will come by and talk about it.
>
> Q. And how did Mr. Barrett respond to your request to go by and look at documents or spreadsheets about whether this multiple was there?
>
> A. I believe he said . . . let me talk to Brian. And we hung up the phone. He called me back and said, We are not doing that. Brian says we don't have to provide anything.

Barrett also wrote a letter dated July 23, 2015, to Wycliff stating that the property was sold on July 17, 2015, but "TRG did not obtain the approval of its lenders and equity investors to the

payment to you of the $200,000 Carried Interest. In addition, TRG failed to achieve a 2.0 equity multiple with respect to the Property at any time prior to the date of the sale." Tusa approved the letter, and testified about its statement that the equity multiple was not achieved:

Q. Okay. What calculations had TRG done to calculate this 2.0 equity multiple?

A. None.

Q. None?

A. None. We didn't—we didn't calculate it, so we presumed that it hadn't been achieved. We didn't calculate it. We could have calculated it, but we didn't.

Q. Say that last part again. I'm sorry.

A. We could have calculated it, but we didn't.

Q. And why didn't you calculate it then, if you could have?

A. Because the consent wasn't made, so there was no point in calculating it.

Tusa testified unequivocally that the reason TRG never made the calculation to determine whether the 2.0 equity multiple had been met was because TRG's equity investor did not consent:

Q. And it's never been calculated?

A. Well, no.

Q. And this 2.0 equity multiple is not a reason that you didn't pay my clients the carried interest payment?

A. We didn't pay it because our equity investor didn't—

Q. Didn't consent?

A. Didn't consent.

Q. And that's the sole reason you didn't pay the carried interest payment?

A. Yes.

Q. Okay. My clients wouldn't have any financial information from TRG to be able to calculate the 2X multiple, would they?

A. No.

Q. Not unless you gave it to them.

–11–

A. Correct.

Q. And you didn't give it to them.

A. No, there was no point in giving it to them.

Q. No point in giving it to them?

A. Our equity investor hadn't consented, so—There were two conditions, and one of them hadn't been met in our opinion.

Q. So the second of the conditions, this 2.0 multiple, my clients couldn't compute it unless you gave them the information.

A. Correct.

On receipt of Barrett's letter, Hepfner again tried to obtain information from Barrett. Barrett again refused:

Q. What reason did Mr. Barrett give you for not providing any information about this investor consent or this two times equity multiple?

A. We didn't have any right to it.

Hepfner also testified that "if we had gotten a one-page deal that we asked for, we would have talked it out. We would have resolved it that day." Instead, "[w]e were told that we had no right to anything." Appellees then engaged counsel to obtain information from TRG about the investor's refusal to consent and the failure to achieve the 2.0 equity multiple. But until they filed this suit, appellees were unable to obtain any information from TRG on either subject. Hepfner testified:

Q. Mr. Hepfner, how were you supposed to calculate the two times equity multiple if you didn't get any information from TRG on it?

A. It would be pretty impossible.

Q. Did you have any of that information on your own?

A. We were—no.

Q. Did you have any access to information on the two times equity multiple other than through TRG?

–12–

A. No. . . . We never received anything. We were told time and time again, we had no right to it. So how were we supposed to know whether they achieved it, they didn't achieve it, whether they got consent, didn't get consent[?].

TRG relies on Hepfner's testimony admitting that there is nothing in the Participation Agreement requiring TRG to calculate the 2.0 equity multiplier if TRG's investor did not consent. TRG also relies on Tusa's testimony that "it was not our intention" to waive the requirement. But the jury was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery, Inc.*, 116 S.W.3d at 761. We presume that the jury resolved these conflicts in appellees' favor. *See City of Keller*, 168 S.W.3d at 819–21.

The evidence is not disputed that appellees requested, and TRG repeatedly refused to provide, the data from which appellees could determine whether TRG "achieve[d] a 2.0 equity multiple," as provided in the Participation Agreement. There is no dispute that TRG's refusal was intentional. As Tusa testified, TRG considered the necessary information to be "sensitive financial information" that "we don't give . . . to anyone outside the organization," and expressly refused appellees' requests for it. It is also undisputed that TRG never attempted the calculation itself in lieu of providing the necessary information to appellees; Tusa testified that it was not necessary to do so because the investor consent condition had not been met. TRG does not suggest any method by which appellees could have overcome TRG's repeated refusals to provide the information and could make the calculation themselves, other than by filing suit, obtaining the information in discovery, and hiring an expert to provide calculations and opinion testimony. Instead, appellees pleaded, offered evidence, and obtained a jury finding that TRG waived the condition.[3]

---

[3] We also note that "'[i]t is elementary that one who prevents or makes impossible the performance of a condition precedent upon which his liability under a contract is made to depend cannot avail himself of its nonperformance.'" *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 146 (Tex. App.—Dallas 2012, no pet.) (quoting *II Deerfield Ltd. P'ship v. Henry Bldg., Inc.*, 41 S.W.3d 259, 265 (Tex. App.—San Antonio 2001, pet. denied)).

We conclude there was legally and factually sufficient evidence to support the jury's finding of waiver in answer to Question 5. We decide TRG's fifth issue against it.

## C. Motion for directed verdict

At the close of plaintiffs' case, TRG moved for directed verdict. TRG argued there was no evidence the 2.0 equity multiple was achieved, and consequently, no evidence that a condition precedent was met for payment of the $200,000 Carried Interest. The trial court denied TRG's motion and the issue was submitted to the jury. The jury made a finding in TRG's favor on the issue. But in its third issue on appeal, TRG argues the trial court's ruling was error.

The jury found in response to Question 2 of the charge that "the 2.0 equity multiplier condition" was not satisfied. But the jury also found, as we have discussed, that TRG waived this condition. Consequently, even if the trial court had granted TRG's directed verdict motion and instructed the jury that the condition was not met, judgment for appellees would have been proper based on the jury's finding that TRG waived the condition. Assuming the trial court's denial of TRG's motion was error, it did not cause the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1) (no judgment may be reversed on ground that trial court made error of law unless court of appeals concludes that the error complained of probably caused the rendition of an improper judgment).

We conclude that any error by the trial court in denying TRG's motion for directed verdict did not cause the rendition of an improper judgment. We decide TRG's third issue against it.

### CONCLUSION

We affirm the trial court's judgment.

/Elizabeth Lang-Miers/
ELIZABETH LANG-MIERS
JUSTICE

171094F.P05

–14–



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

TRG-BRAES BROOK, LP, Appellant

No. 05-17-01094-CV          V.

JAMES P. HEPFNER, JOHN W.
AIRHART, and CHRISTOPHER SMITH,
Appellees

On Appeal from the 44th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DC-16-00088.
Opinion delivered by Justice Lang-Miers;
Justices Evans and Schenck, participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees James P. Hepfner, John W. Airhart, and Christopher Smith recover their costs of this appeal from appellant TRG-Braes Brook, LP.

Judgment entered this 17th day of July, 2018.